# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

FERNANDO ORTIZ-MONDRAGON,

    Petitioner,

    v.                                                     Case No. 15-CV-1412

DENISE SYMDON,

    Respondent.

## DECISION AND ORDER

Fernando Ortiz-Mondragon seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Ortiz-Mondragon pled no contest to substantial battery, criminal damage to property, and disorderly conduct, all with a domestic abuse enhancer. (Habeas Pet., Docket # 1 at 2.) Ortiz-Mondragon alleges that his conviction and sentence were unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied. However, I will grant a certificate of appealability.

## BACKGROUND

Ortiz-Mondragon came to the United States from Mexico in 1997, and moved to Wisconsin in 2002. (Answer, Ex. 9, *State v. Ortiz-Mondragon*, 2015 WI 73, No. 2013AP2435 (Wis. July 9, 2015), Docket # 7-9 at 6.) He has four children, all of whom are United States citizens and Wisconsin residents. (*Id.*)

According to the criminal complaint, in September 2012, Ortiz-Mondragon violently attacked J.S., who was his cohabiting girlfriend at the time and who is the mother of two of his children. (*Id.* at 7.) Ortiz-Mondragon became enraged because J.S. was talking to a male

neighbor on the phone. (*Id.*) Ortiz-Mondragon jumped on top of J.S. while she was talking on the phone in bed. (*Id.*) Ortiz-Mondragon put his hands around J.S.'s neck and began squeezing. (*Id.*) J.S. had trouble breathing and thought that Ortiz-Mondragon was going to kill her. (*Id.*) When J.S. managed to get off the bed and tried to leave the room, Ortiz-Mondragon punched her in the face and mouth and hit her in the back of the head. (*Id.*) J.S.'s head bled profusely. (*Id.*) Ortiz-Mondragon also broke J.S.'s phone in half. (*Id.*) When J.S. later sought treatment for her injuries, a wound on her face required five staples. (*Id.*) Their two young children were in the room at the time of the incident. (*Id.*)

On September 14, 2012, Ortiz-Mondragon was charged with substantial battery, false imprisonment, felony intimidation of a victim, criminal damage to property, and disorderly conduct, all with a domestic abuse enhancer under Wis. Stat. § 968.075. (*Id.* at 6.) The State made a plea offer to Ortiz-Mondragon, that if he would plead guilty or no contest to substantial battery, criminal damage to property, and disorderly conduct, all with a domestic abuse enhancer, the State would dismiss and read-in the other charges. (*Id.* at 7.) The State would recommend three years of probation and four months in jail as a condition of probation. (*Id.*)

At the circuit court plea and sentencing hearing on November 27, 2012, Ortiz-Mondragon's attorney informed the court that he had presented the State's plea offer to Ortiz-Mondragon, "given him paperwork to use to study it, given him information to use in counseling, and [Ortiz-Mondragon] has just now confirmed that now he's made his final decision. He would like to take the offer." (*Id.* at 8.) Counsel then handed the plea questionnaire and waiver of rights form, along with some other papers, to the court. (*Id.*) Ortiz-Mondragon had signed the plea questionnaire and waiver of rights form, which stated,

*inter alia*: "I understand that if I am not a citizen of the United States, my plea could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law." (*Id.*) Counsel had signed the plea questionnaire and waiver of rights form immediately below the following affirmation: "I am the attorney for the defendant. I have discussed this document and any attachments with the defendant. I believe the defendant understands it and the plea agreement. The defendant is making this plea freely, voluntarily, and intelligently." (*Id.*)

Ortiz-Mondragon stated that he wished to plead no contest to three counts pursuant to the plea agreement. (*Id.*) The circuit court then informed him of the possible immigration consequences of his pleas:

> THE COURT: All right. The law requires I address you now and advise you of the following: If you're not a citizen of the United States, the plea you offer me could result in your deportation, the exclusion of admission, or the denial of naturalization under federal law. . . .
> These are collateral consequences to [sic] on top of whatever I sentence you to. Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: All right. Do you still wish to offer me these pleas then?
>
> THE DEFENDANT: Yes.

(*Id.* at 9.) The circuit court then confirmed that Ortiz-Mondragon and his attorney had discussed the plea questionnaire and waiver of rights form, which contained a warning about possible immigration consequences of a conviction:

> THE COURT: All right. In my right hand I have a plea-questionnaire-and-waiver-of-rights form. I have the standard jury instruction for the charge of substantial battery with intent to cause bodily harm as well as the elements of criminal damage and disorderly conduct. Do you see all these documents?
>
> THE DEFENDANT: Yes.

3

THE COURT: Did you sign the plea questionnaire?

THE DEFENDANT: Yes.

THE COURT: Before you signed it, did you read it over carefully?

THE DEFENDANT: Yes.

THE COURT: And while you were going over all these documents, did you have an opportunity to fully discuss it with your attorney [. . .]?

THE DEFENDANT: Yes.

THE COURT: And are you satisfied with his representation thus far?

THE DEFENDANT: Yes.

(*Id.* at 9–10.) The court concluded: "I'm going to find the defendant's pleas today to be freely, voluntarily, and intelligently entered on the record I have made. I'll incorporate in support of that the plea-questionnaire-and-waiver-of-rights form." (*Id.* at 10.) The court then determined that the facts supported Ortiz-Mondragon's pleas and judged him guilty of substantial battery and criminal damage to property and disorderly conduct. (*Id.*)

The State explained its joint recommendation for three years of probation and four months in jail, noting that it had consulted with the victim, this was a "fairly violent offense," and Ortiz-Mondragon had no prior criminal record. (*Id.*) The State also noted that Ortiz-Mondragon "was on an immigration hold at the . . . initial appearance," but was not on any other type of hold. (*Id.*)

J.S., the victim of Ortiz-Mondragon's domestic abuse, then spoke to the court. (*Id.*) She stated that she would like the felony battery charge reduced to a misdemeanor, noting that Ortiz-Mondragon had four children that they were trying to keep in the United States, but "if he ends up with a felony charge, that's not going to happen." (*Id.*) The court informed

4

J.S. that Ortiz-Mondragon had just been found guilty of a felony. (*Id.* at 10–11.) After discussing sentencing credit, which the court granted, the court then asked counsel whether Ortiz-Mondragon had an Immigration and Customs Enforcement hold. (*Id.* at 11.) Counsel stated, "I think there is, but the information I get is secondhand." (*Id.*) Ortiz-Mondragon then apologized for his behavior and stated that he "never had a problem like this before." (*Id.*)

After discussing its reasoning, the court adopted the joint recommendation to place Ortiz-Mondragon on probation for three years, and sentenced him to four months in the county jail as a condition of probation. (*Id.* at 12.) J.S. asked if Ortiz-Mondragon would "be let go" after his jail sentence. (*Id.*) The court stated that he would be let go "if the immigration doesn't put a hold on him. If the immigration people put a hold on him, that's a federal issue. Our officers have nothing to do with that." (*Id.*)

A letter from Immigration and Customs Enforcement ("ICE") filed with the circuit court on December 12, 2012 requested that the court forward to ICE certified copies of the complaint, information, judgment, and commitment order in Ortiz-Mondragon's case. (*Id.* n.8.) The letter stated that these documents would help ICE "in its efforts to expeditiously remove alien criminals from the United States." (*Id.*) Under "charge(s)," the letter stated, "940.19(2) Substantial Battery—Intend Bodily Harm." (*Id.*)

After Ortiz-Mondragon completed his jail sentence, apparently in early or mid-January 2013, Immigration and Customs Enforcement took him into custody and commenced removal proceedings against him. (*Id.* at 12 and n.7.) He agreed to a voluntary departure to avoid a deportation on his record. (*Id.*) It is unclear when he departed for Mexico, but it is undisputed that he did so at some point before November 25, 2015. (Resp. Br., Docket # 14 at 6–11; Pet. Reply Br., Docket # 18 at 1–3.)

In September 2013, Ortiz-Mondragon filed a postconviction motion to withdraw his no-contest plea to substantial battery on grounds of ineffective assistance of counsel. (Docket # 7-9 at 12.) In the motion, Ortiz-Mondragon argued that his substantial battery as an act of domestic abuse was a "crime involving moral turpitude" under federal immigration law, thereby rendering him subject to mandatory deportation and permanent exclusion from the United States. (*Id.* at 12–13.) He argued that these consequences of his substantial battery conviction were clear and that under *Padilla v. Kentucky*, 559 U.S. 356 (2010), his attorney performed deficiently in failing to inform him of these consequences. (*Id.*) Ortiz-Mondragon further argued that this deficiency prejudiced him. (*Id.*) He contended that, had he known the immigration consequences of this conviction, he would have sought a different plea agreement or would have insisted on going to trial in order to preserve the possibility of remaining in or returning to the United States to be with his family. (*Id.*)

On October 9, 2013, the circuit court denied Ortiz-Mondragon's motion to withdraw his plea. (Docket # 1-2.) On October 7, 2014, the court of appeals affirmed the circuit court's order. (Habeas Pet., Ex. 3, *State v. Ortiz-Mondragon*, Appeal No. 2013AP2435-CR (Wis. Ct. App. Oct. 7, 2014), Docket # 1-3.) On July 9, 2015, the Supreme Court of Wisconsin affirmed. (Answer, Ex. 9, *State v. Ortiz-Mondragon*, 2015 WI 73, No. 2013AP2435 (Wis. July 9, 2015), Docket # 7-9.) On November 25, 2015, Ortiz-Mondragon filed a petition for a writ of habeas corpus in this court. (Habeas Pet., Docket # 1.) On November 27, 2015, the Wisconsin Department of Corrections finally discharged Ortiz-Mondragon from his term of probation. (Answer, Docket # 7 at 2.)

## JURISDICTION

As an initial matter, the respondent argues that this court has no jurisdiction because Ortiz-Mondragon was in Mexico at the time he filed his petition, either rendering the case moot or rendering Ortiz-Mondragon no longer "in custody" as required by 28 U.S.C. § 2254(a). (Answer, Docket # 7 at 2; Resp't Br., Docket # 14 at 6–11.)

Although the respondent raises the issue of mootness in both its answer and its brief, the respondent concedes that "a conviction that will bar an alien from reentering the United States will prevent a habeas petition from being mooted." (Docket # 14 at 7–8.) Thus, respondent concedes, "the question here is not whether his case became moot but whether he was 'in custody' at the time he filed his petition." (*Id.* at 11.)

It is well established, and the respondent concedes, that a petitioner who has been released on probation, parole, or supervised release is considered to be "in custody" for purposes of habeas relief. (Docket # 14 at 7 (citing *Jones v. Cunningham*, 371 U.S. 236, 242 (1963), *Carafas v. LaVallee*, 291 U.S. 234, 240 (1968).) *See also Maleng v. Cook*, 490 U.S. 488, 491 (1989) (prisoner on parole was still "in custody" under his unexpired sentence because of the conditional nature of release); *Cochran v. Buss*, 381 F.3d 637, 640 (7th Cir. 2004); *Valona v. United States*, 138 F.3d 693, 695 (7th Cir. 1998) ("Parole is a form of 'custody.'"). *Cf.* Wis. Stats. § 973.10(1) ("Imposition of probation shall have the effect of placing the defendant in the custody of the department and shall subject the defendant to the control of the department.") Had Ortiz-Mondragon been in the United States when he filed his petition, this court would unquestionably have jurisdiction. The wrinkle here is whether Ortiz-Mondragon's absence from the country changes that outcome.

The respondent does not cite, and I have not found, any federal case holding that mere absence from the United States at the time of filing defeats a habeas petition for a petitioner whose probation is ongoing. The cases cited by the respondent to support this position are distinguishable from this one in relevant ways. In *Samirah v. O'Connell*, 335 F.3d 545 (7th Cir. 2003), the petitioner had obtained permission from Immigration and Naturalization Services ("INS") to travel abroad for two weeks. While Samirah was abroad, INS revoked that permission. As a consequence, Samirah was unable to return to the United States. Samirah filed a petition for a writ of habeas corpus, arguing that this exclusion from the United States amounted to being "in custody." The Court of Appeals for the Seventh Circuit held otherwise: "Although the word 'custody' is elastic, all definitions of it incorporate some concept of ongoing control, restraint, or responsibility by the custodian." *Samirah*, 335 F.3d 545, 549. "Samirah is, in some sense, restrained insofar as he cannot enter the United States. But that restraint, such as it is, only puts him on par with the billions of other non-U.S. citizens around the globe who may not come to the United States without the proper documentation." *Id.* at 549–50.

Thus, *Samirah* stands for the proposition that mere exclusion from the United States does not amount to being "in custody" for habeas purposes. Later cases confirm this rule. In *Rivas-Melendrez v. Napolitano*, 689 F.3d 732 (7th Cir. 2012), a lawful permanent resident who had been removed to Mexico based on a criminal conviction challenged his removal in a petition for a writ of habeas corpus. Like Samirah, Rivas-Melendrez based his statutory jurisdictional claim on his exclusion from the country, not on the fact that he was on probation for a criminal sentence. Other than his exclusion from the United States, there were no constraints at all upon Rivas-Melendrez's liberty by virtue of his removal. Thus, the Seventh

Circuit held that he was not "in custody." *Id.* at 738–39. *See also Nino v. Johnson*, No. 16-CV-2876, 2016 WL 6995563, *6 (N.D. Ill. Nov. 30, 2016).

The respondent also cites to the Tenth Circuit case of *United States v. Vera-Flores*, 496 F.3d 1177 (10th Cir. 2007), in which that court found that a criminal defendant's appeal of his sentence was moot following removal from the United States to Mexico. (Docket # 14 at 10.) There are several reasons I decline to analyze this case in light of *Vera-Flores*. First, it involved mootness under Article III's case-or-controversy requirement, not the "in custody" requirement of the habeas statute, and the respondent has conceded that Ortiz-Mondragon's case is not moot. Second, it was not decided by the Seventh Circuit, and at least one other circuit court of appeals has declined to follow it. *U.S. v. Heredia-Holguin*, 823 F.3d 337, 342 (5th Cir. 2007).

Ortiz-Mondragon's case differs from *Samirah* and *Rivas-Melendrez* in that Ortiz-Mondragon does not base his jurisdictional claim on the fact that he was excluded from the United States. Rather, his claim to have been "in custody" is based on the fact that he was on probation with the Wisconsin Department of Corrections. While I have found no habeas case with facts precisely similar to this one, there are a number of cases that provide some guidance. In *United States v. Campos-Serrano*, 404 U.S. 293, 294 n.2 (1971), the Supreme Court held that although a respondent was in Mexico, he was "still under the sentence of the District Court and on probation subject to conditions imposed by the District Court. Should he violate those conditions, he will be subject to imprisonment under his continuing criminal sentence." While the facts of *Campos-Serrano* are distinguishable, that case supports a conclusion that absence from the United States does not alone prevent the terms of a probation from continuing to apply. *See also Heredia-Holguin*, 823 F.3d at 341–42. Similarly, several cases have

held that a person detained abroad may nevertheless be "in custody" of the United States for purposes of the habeas statute. *See e.g. Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.C. Cir. 2004) (citizen detained abroad purportedly at the behest of the United States could be "in custody," rejecting "the unreviewable power to separate an American citizen from the most fundamental of his constitutional rights merely by choosing where he will be detained or who will detain him."); *Portillo v. Bharara*, 527 Fed. Appx. 48, 50 (2nd Cir. 2013) ("Portillo's alien status and detention outside the United States do not necessarily preclude a finding of constructive custody."). Although these cases are factually distinguishable, they support a conclusion that mere absence from the country at the time of filing does not preclude habeas jurisdiction.

As noted, Ortiz-Mondragon is not basing his claim to be "in custody" on his exclusion from the United States; rather, his claim to be "in custody" is based on the fact that his period of probation was ongoing at the time he filed his petition. Because there is clear precedent that a petitioner on probation is "in custody" for purposes of the habeas statute, that the terms of a conditional release may still apply to one who has been deported, and that absence from the country at the time of filing does not alone defeat a habeas petition, I conclude that this court has jurisdiction to hear Ortiz-Mondragon's petition for a writ of habeas corpus.

**STANDARD OF REVIEW**

Ortiz-Mondragon's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under the AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable

10

determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

## ANALYSIS

Citing to *Padilla v. Kentucky*, 559 U.S. 356 (2010), Ortiz-Mondragon argues that his attorney's failure to provide him with specific advice about the adverse immigration consequences of his plea to substantial battery, domestic abuse, amounted to ineffective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution. (Docket # 1 at 14–16.)

*1.  Legal Standard*

The clearly established Supreme Court precedent for ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel, Ortiz-Mondragon must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. "Once a plea of guilty has been entered, non-jurisdictional challenges to the constitutionality of the conviction are waived and only the knowing and voluntary nature of the plea may be attacked." *United States v. Brown*, 870 F.2d 1354, 1358 (7th Cir. 1989). Thus, a guilty plea generally closes the door to claims of constitutional error. There is an exception, however, for instances where one's plea is rendered involuntary due to the ineffective assistance of counsel. *Avila v. Richardson*, 751 F.3d 534, 536 (7th Cir. 2014). A habeas petitioner "cannot just assert that a constitutional violation preceded his decision to plead guilty or that his trial counsel was ineffective for failing to raise the constitutional claim"; rather, he "must allege that he

entered the plea agreement based on advice of counsel that fell below constitutional standards." *Hurlow v. United States*, 726 F.3d 958, 966 (7th Cir. 2013).

In the context of a guilty plea, *Strickland*'s "prejudice" requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985).

A court deciding an ineffective assistance claim need not approach the inquiry "in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Id.*

Specifically, as to defense counsel's obligations to advise non-citizen clients of adverse immigration consequences, the Supreme Court in *Padilla* held that counsel must advise a non-citizen defendant regarding the risk of deportation. 559 U.S. at 367–69. However, the extent of that duty depends upon whether "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for [the] conviction." *Id.* at 368. The Court continued:

> Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

*Id*. at 368–69. The Court distinguished cases such as Padilla's from those in which the consequences of the plea were not evident from the immigration statute alone:

> Immigration law can be complex, and it is a legal specialty of its own. . . . There will . . . undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward . . ., a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences.

*Id*. at 369.

In sum, the Supreme Court delineated two categories of cases, each invoking different obligations to advise non-citizens of the immigration consequences of their criminal charges. Where the law is "clear, succinct, and explicit," a criminal defense attorney's duty to advise about deportation consequences is heightened. However, where the law is not succinct and straightforward, the attorney's duty is limited to simply advising the non-citizen client that pending criminal charges may carry a risk of adverse immigration consequences. I will refer to these two different duties as the "specific duty" and the "general duty."

### 2. *Application to This Case*

In addressing Ortiz-Mondragon's claim, the Wisconsin Supreme Court properly cited to *Strickland*. (Docket # 7-9 at 17–18.) Moreover, the Wisconsin Supreme Court analyzed

14

whether trial counsel's performance was deficient under *Strickland* in light of *Padilla*. (*Id.* at 17–18.) Ortiz-Mondragon has not shown that the Wisconsin Supreme Court incorrectly identified the controlling legal standard; thus, the question before me is whether the court unreasonably applied *Padilla* to the facts of this case.

In applying *Padilla* to this case, the Wisconsin Supreme Court correctly recognized the two categories of counsel's duty to advise non-citizen criminal defendants of adverse immigration consequences. In discerning whether Ortiz-Mondragon's counsel's duty was specific or general, the court began by examining whether immigration law is succinct, clear, and explicit that Ortiz-Mondragon would be deported and excluded because his substantial battery was a crime involving moral turpitude. (Docket # 7-9 at 19–32.) First, the court noted that the term "crimes involving moral turpitude" is not defined in the statute or the federal regulations implementing it. (Docket # 7-9 at 20–21.) The court noted that the case law that analyzes whether a crime qualifies as a crime involving moral turpitude for purposes of deportation often uses terms of generality rather than specifics, making a definition elusive. (*Id.* at 21–23.) Further, in addition to the lack of a precise definition, the court cited to a split in the federal courts' approaches in analyzing crimes involving moral turpitude, observing that it is problematic to ascertain whether any particular crime qualifies as a crime involving moral turpitude. (*Id.* at 23.)

Finally, the court noted that in *In re Silva-Trevino*, 24 I. & N. Dec. 687, 2008 WL 4946455 (A.G. 2008), *vacated by Matter of Silva-Trevino*, 6 I. & N. Dec. 550, 2015 WL 1754705 (A.G. 2015), the U.S. Attorney General had added to the complexity of determining whether a crime qualifies as a crime involving moral turpitude, leaving this question in a "state of flux." (*Id.* at 24–25.) In that opinion, the Attorney General acknowledged the lack of guidance

in the text itself, noting that the statute was silent as to a definition of that term and also how to determine whether a crime fit that category, and acknowledged that "to the extent it suggests a method, the text actually cuts in different directions." *Id.* at **6. The Attorney General noted judicial confusion and a circuit split regarding how to apply the statute, and that in any event, "administrative agencies are not bound by prior judicial interpretations of ambiguous statutory provisions." *Id.* at **6–9. The Attorney General attempted to untangle the knot by prescribing a three-step test: First, the Bureau of Immigration Appeals ("BIA") would look to the statute of conviction and determine whether there is a "realistic probability" that the statute would be applied to reach conduct that does not involve moral turpitude. Second, if such a categorical inquiry does not resolve the question, the BIA would engage in a "modified categorical inquiry" and examine the record of conviction, including documents such as the indictment, the judgment of conviction, jury instructions, a signed guilty plea, and the plea transcript. Finally, if the record of conviction was inconclusive, the BIA would consider any additional evidence deemed necessary or appropriate to resolve accurately the moral turpitude question. *Id.* at **9–18.

After surveying the landscape as discussed above, the Wisconsin Supreme Court concluded:

> [F]ederal immigration law does not succinctly, clearly, and explicitly provide that Ortiz-Mondragon's substantial battery was a crime involving moral turpitude such that his counsel's advice should have been different. The methodology for determining whether a crime qualifies as a crime involving moral turpitude varies by jurisdiction and is in a "state of flux." The cases that Ortiz-Mondragon cites fail to provide a succinct, clear, and explicit answer as to whether Ortiz-Mondragon's substantial battery qualified as a crime involving moral turpitude. Accordingly, his trial counsel "need[ed] [to] do no more than advise [him] that pending criminal charges may carry a risk of adverse immigration consequences."

(*Id.* at 31–32 (internal citations omitted)).

This is a reasonable application of *Padilla* to the facts of this case. In *Padilla*, the Court noted that counsel "could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute," contrasting this statute with those addressing "some broad classification of crimes." *Padilla*, 559 U.S. at 368. The Court again emphasized that "[t]he consequences of Padilla's plea could easily be determined from reading the removal statute." *Id.* at 369. In clear contrast, the Court held that "[w]hen the law is not succinct and straightforward, a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Id.*

Moreover, of particular importance here, *Padilla* itself recognized the problems posed by defining "crime involving moral turpitude." In the relevant portion of his concurring opinion, referenced favorably by the majority, *id.* at 369, Justice Alito pointed to the difficulty of imposing a duty to provide advice about deportation when statutory terms are ambiguous or may be confusing to attorneys who do not specialize in immigration law:

> Most crimes affecting immigration status are not specifically mentioned [in the immigration statutes], but instead fall under a broad category of crimes, such as crimes involving moral turpitude or aggravated felonies. As has been widely acknowledged, determining whether a particular crime is an "aggravated felony" or a "crime involving moral turpitude . . . " is not an easy task.

*Id.* at 377–78. It was therefore reasonable for the Wisconsin Supreme Court to conclude that "crimes involving moral turpitude" is the sort of broad classification of crimes that invokes only a general duty to advise on deportation consequences.

Ortiz-Mondragon argues that, under *Padilla*, the Wisconsin Supreme Court erred in analyzing whether the term "crime involving moral turpitude" itself was clear, rather than

whether the immigration consequence of Ortiz-Mondragon's conviction was clear. (Pet. Br., Docket # 11 at 15.) Ortiz-Mondragon's argument has some appeal. Before the Wisconsin Supreme Court, two justices were persuaded by this argument and dissented. (Docket # 7-9 at 45–63.) In my view, Ortiz-Mondragon's argument would be persuasive if the question before the Wisconsin Supreme Court had been whether counsel had been deficient for failing to inform Ortiz-Mondragon that his conviction for substantial battery with domestic abuse enhancer carried a risk of deportation. As the dissenting justices pointed out, aside from the subsection on "crimes involving moral turpitude," 8 U.S.C. § 1227(a)(2)(E)(i) renders a non-citizen deportable for a conviction of domestic violence. (Docket # 7-9 at 46–63.) This was a clear and succinct immigration law that clearly encompassed Ortiz-Mondragon's conviction for substantial battery with a domestic violence enhancer, and thus it triggered the specific duty to advise. Unfortunately, because ineffective assistance of counsel for failing to advise about deportability under the domestic violence provision had not been raised, briefed, or argued by the parties, the Wisconsin Supreme Court did not address it. (*Id.* at 3 n.4.) Neither did the court have before it the broad question of whether there was any immigration law that triggered the specific duty to advise in Ortiz-Mondragon's case. Rather, the court had before it only the narrow question presented by Ortiz-Mondragon's briefing: whether there was clear and straightforward immigration law that the conviction qualified as a "crime involving moral turpitude."

As discussed above, on the narrow question presented to it, the Wisconsin Supreme Court's approach fits squarely within *Padilla*. The task presented to the court was to determine whether immigration law was succinct and clear that Ortiz-Mondragon's substantial battery qualified as a "crime involving moral turpitude" such that it triggered the specific duty to

advise. The Wisconsin Supreme Court analyzed the elusive definition of "crime involving moral turpitude," then discussed the difficulty of determining whether a particular crime qualified as such a crime. The court then analyzed and distinguished the cases that Ortiz-Mondragon cited in support of his position that his substantial battery conviction qualified as a crime involving moral turpitude. Having found that the law was not succinct, clear, and explicit regarding the immigration consequences of Ortiz-Mondragon's plea, the Wisconsin Supreme Court concluded that counsel had only a general duty to advise about deportation consequences. (Docket # 7-9 at 31–32.)

Additionally, the court concluded that counsel had met this general duty by conveying to Ortiz-Mondragon the information contained in the plea questionnaire and waiver of rights form—specifically, that Ortiz-Mondragon's plea could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law—and discussing it with him. (*Id.* at 32–44.) *Padilla* does not prescribe how counsel should execute the general duty to advise; thus, I cannot say it was contrary to, or an unreasonable application of, *Padilla* for the Wisconsin Supreme Court to conclude that counsel had performed adequately by providing the plea questionnaire.

For the reasons above, I conclude that the Wisconsin Supreme Court's determination that Ortiz-Mondragon's trial counsel was not ineffective was neither contrary to nor an unreasonable application of *Strickland* and *Padilla.*

## CONCLUSION

To obtain habeas relief, Ortiz-Mondragon must show that the Wisconsin Supreme Court's ineffective assistance of counsel analysis was contrary to or an unreasonable application of *Strickland* and *Padilla*. While I am sympathetic to Ortiz-Mondragon's plight, I

must conclude that the Wisconsin Supreme Court's decision on the narrow issue presented to it was neither contrary to nor an unreasonable application of *Strickland* and *Padilla*. Accordingly, Ortiz-Mondragon's claim does not present a basis to grant relief under 28 U.S.C. § 2254. The petition will therefore be denied and this case dismissed.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n.4). Here, I find that the issues presented by Ortiz-Mondragon's petition deserve encouragement to proceed further. Accordingly, I will grant a certificate of appealability to encourage development of these issues.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Ortiz-Mondragon's petition for a writ of habeas corpus (Docket # 1) is **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability shall issue.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 25th day of January, 2019.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge